UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

ADRIAN GAUTHIER,

                         Plaintiff,                 Civil Action No.: 12-cv-15146
                                                    Honorable Denise Page Hood
            v.                             Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                         Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 17]**

Plaintiff Adrian Gauthier brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.        **RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's decision is supported by substantial evidence in the record. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Gauthier's motion [14] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.   REPORT

### A.   Procedural History

On December 30, 2009, Gauthier filed applications for DIB and Supplemental Security Income ("SSI"), alleging disability as of October 30, 2009.  (Tr. 133-38).  His SSI claim was denied on January 13, 2010, because Gauthier was found to receive too much income to qualify. (Tr. 97-104).  His DIB claim was denied initially on July 7, 2010.  (Tr. 80-84).  Thereafter, Gauthier filed a timely request for an administrative hearing, which was held on May 10, 2011 before ALJ Janice Shave.  (Tr. 27-78).  Gauthier, represented by attorney Hillary Briolat, testified, as did vocational expert ("VE") Adolph Cwik.  (*Id.*).  On June 9, 2011, the ALJ found Gauthier not disabled.  (Tr. 12-27).  On September 18, 2012, the Appeals Council denied review. (Tr. 1-6).  Gauthier filed for judicial review of the final decision on November 20, 2012.  [1].

### B.   Background

#### 1.   *Disability Reports*

In a January 12, 2010 disability report, Gauthier reported that the conditions preventing him from working are back pain, chronic obstructive pulmonary disorder, hypertension, restless leg syndrome and sleep apnea.  (Tr. 151).  He reported that he stopped working in October 2009 due to his conditions.  (*Id.*).  He had previously worked for twenty-eight years as the co-owner of an insurance company, where he "oversaw office operations, sales, claim settlement, customer service, scheduling, [and] payroll."  (Tr. 153).  In this job he had to lift up to fifty pounds occasionally, and do some stooping and crouching.  (Tr. 154).  Gauthier reported taking numerous medications for his conditions including Darvocet, Mobic and Neurontin for pain, Flexeril as a muscle relaxant, Nexium for his stomach and Mirapex for restless leg syndrome. (Tr. 155).  He was also prescribed a CPAP machine for sleep apnea.  (*Id.*).  He reported

2

undergoing back surgery in 1999 and 2000 and that he was currently being followed by pain management.  (Tr. 157; 159).

In a February 4, 2010 function report, Gauthier reported that his day consists of tending to his personal care, managing his medications, going into town for a hot chocolate, handling household chores "the best that I can," taking more medication, lying down to relieve back pain, eating dinner, watching television, taking additional medication and going to bed.  (Tr. 164). Approximately three to four days a week he takes a hot bath to relieve pain.  (*Id.*).  Gauthier reported he is unable to engage in any of the activities he used to enjoy, including hunting, fishing, hiking, boating, gardening, running, walking, playing sports or cycling.  (Tr. 165).  He also used to enjoy going to classic car shows but does not go as often as he cannot walk for long periods of time.  (Tr. 168).  He reported having to leave family functions early due to his inability to sit or stand for great lengths of time.  (Tr. 169).  His back and restless leg condition also interfere with his sleep, keeping him awake late and then causing him to awaken every 2 to 2 ½ hours when he does sleep.  (Tr. 165).  His sleep apnea also interferes with his sleep.  (*Id.*).

Gauthier reported being able to prepare simple meals daily, mow the grass on a riding lawn mower (with multiple breaks), do minor home repairs and "help keep the house clean." (Tr. 166).  He cannot perform any other yard work.  (Tr. 166-67).  He can drive and ride in a car and leave the house by himself.  (Tr. 167).  He can also shop, but does not do so for very long as walking on the store floor hurts his back and legs.  (*Id.*).  Gauthier reported that his conditions interfere with his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs and concentrate (due to his medications).  (Tr. 169).  He can walk a half a mile before needing to rest for 15-20 minutes.  (*Id.*).  He can pay attention for about 20 minutes.  (*Id.*).  In a narrative, Gauthier reported that his back and leg conditions continue despite three previous surgeries and

3

three or four rounds of physical therapy. (Tr. 171). He reported that injections also have not provided much relief. (*Id.*). He stated that he cannot "function in the capacity required of [him] for the office/field environment of [his] profession." (*Id.*).

In a July 27, 2010 disability appeals report, Gauthier reported that his condition had worsened in that he was unable to sleep very well or for long periods of time and that his condition was now causing him to become depressed. (Tr. 184). He reported his medications as including Mirapex, Ambien, Mobic, Flexeril, Lunesta, Lisinopril, Neurontin and Vicodin, as well as Nexium for reflux. (Tr. 187; 189). He reported that his "legs, feet and back hurt more now than they did before," and that he "can only tolerate [ ] activity for about 15 minutes before [his] back begins to really burn and hurt, followed by [his] leg(s)." (Tr. 188). He further reported that his doctor was considering surgically implanting a device to block or lessen the pain. (Tr. 190).

In a December 9, 2010 updated medications report, Gauthier reported taking Neurontin, Lunesta, Flexeril, Mobic and Vicodin, all at bed time only, as well as Mirapex twice a day for restless leg syndrome. (Tr. 311). Gauthier also began keeping a journal of his condition, beginning in December 2010, but then stopped after two entries and resuming in March 2011 for about two weeks. (Tr. 203-209). In the journal he reported on his pain and physical activity, capabilities, medicine, and doctor visits. (*Id.*). Among the entries, Gauthier reported being unable to substantially help decorate his family's Christmas tree due to pain, being unable walk more than 10 minutes in the hardware store due to burning and pain, and difficulty navigating stairs on a trip to Mackinac City. (Tr. 203-204). This journal was submitted to and included in the exhibits before the ALJ. (Tr. 26) (referencing exhibit 10E).

### 2. *Plaintiff's Testimony*

At the hearing Gauthier testified that he is prevented from working by pain in his back

4

and his legs, as well as lack of sleep that leaves him "very confused and forgetful." (Tr. 35). He testified about pain and burning in his lower back and legs that increases with sitting, walking or standing. (*Id.*). He testified to taking numerous medications, including Vicodin, Mobic, Flexeril, Neurontin, and Mirapex. (Tr. 48-49). He also receives back injections every six weeks that lessen the pain for a couple of days at a time. (Tr. 48). He has been referred to a doctor for implantation of a cervical stimulation device but has so far resisted it. (*Id.*).

Gauthier testified that he used to be a self-employed insurance agent, but that he had to stop working because he was unable to continue the physical portion of his job, which included walking properties, measuring buildings, and inspecting wiring and heating systems. (Tr. 39; 41; 47 55-56). The ALJ pointed out that one of the medical records of Gauthier's primary physician noted that he had offered this as the reason he stopped working, but that he had not informed "his employer"[1] of this reason at the time he retired. (Tr. 41-42). Gauthier maintained that he had told his employer that he needed to stop working due to his condition. (*Id.*).

Gauthier testified that he enjoys hunting and fishing, but that he cannot do these things for long periods of time any more due to his conditions. (Tr. 38-39). He testified that he will ride an all-terrain vehicle to hunt (Tr. 45; 55), but that he cannot clean his kill and he cannot sit very long in the blind. (Tr. 53-54). He also cannot stand very long to fish from the bank. (Tr. 39; 54). He mows his lawn with a riding lawn mower, but only for a half hour at a time before needing to rest, resulting in it taking him all day to mow his yard. (Tr. 46).

---

[1] Since Gauthier was self-employed, it appears that the doctor completing the medical record used the term "employer" in error, and that he was actually referring to a person at an umbrella insurance agency who Gauthier described as his supervisor. (Tr. 40-42). When questioned about the record, Gauthier testified that he had told the supervisor that he "could no longer [walk around properties to provide estimates] especially in the winter months…" (Tr. 41). However, Gauthier also testified that he "had to give [the agency] a six-month notification in order to get the extended earnings." (Tr. 41).

Gauthier testified that he underwent a consultative examination by a doctor for the Social Security Administration.  (Tr. 42).  He testified that the examination took approximately five minutes and that he was not asked to do many of the things the doctor's report stated that he did.  (Tr. 43-44; 49-51).  Gauthier testified that a subsequent evaluation by his own doctor was much more comprehensive.  (Tr. 51-52).  However, Gauthier testified that he was sore for three days after that evaluation and was not able to engage in his usual activities.  (Tr. 52).  Gauthier testified that he is able to stand for 5-10 minutes at a time, sit for 25 minutes before needing to lie down, and walk for about a half mile or 20 minutes before needing to rest.  (Tr. 44; 52).  He is able to drive about an hour before needing to stop.  (Tr. 58-59).

3.    *Medical Evidence*

As Gauthier's appeal only challenges the ALJ's findings regarding his spinal condition, the Court will discuss the record medical evidence only as it relates to that condition.

a.    *Treating Sources*

Gauthier underwent physical therapy from August 7, 2008, until September 22, 2008, for lumbar strain and right lower extremity radiculopathy.  (Tr. 269).  According to the discharge summary, Gauthier met all but one of his long term goals for therapy and was discharged "noting increased walking distances with less discomfort and he is independent with his home exercise program."  (*Id.*).  Gauthier underwent a lumbosacral x-ray on October 13, 2008, which revealed mild multilevel spondylosis, unremarkable sacroiliac joints, and no loosening of his surgical hardware.  (Tr. 253; 270).  The x-ray did also note "calcific atherosclerotic changes."  (*Id.*).

At an appointment with his primary physician, Dr. Mark Drogowski, on October 20, 2008, Gauthier reported increased lower back pain radiating into his right buttocks that is worse during the day.  (Tr. 246).  He reported tingling and numbness in his ankle and foot.  (*Id.*).  An

6

examination revealed tenderness at his surgical incision and at his SI joint, mild spasm at the SI joint and a negative straight leg raising test. (*Id.*). His strength, motor function, deep tendon reflexes and sensation were all intact. (*Id.*). Although the treatment notes are not completely legible, it appears Dr. Drogowski managed Gauthier's medications at this appointment. (*Id.*).

Gauthier next returned to Dr. Drogowski on February 2, 2009, for an unrelated condition. (Tr. 245). Again, the treatment notes are difficult to read, but it does appear a musculoskeletal examination was conducted and a straight leg raising test was negative. (*Id.*). Chronic lumbosacral pain was diagnosed. (*Id.*). He returned on August 31, 2009, complaining of increased back pain for the last month, mainly on the right side of his lumbosacral area, radiating into his buttocks. (Tr. 244). While the notes are fairly illegible, it appears he complained also of occasional numbness in his ankle affecting his gait. (*Id.*). His pain increases at the end of the day. (*Id.*). An examination revealed an antalgic gait and a limp in the right leg. (*Id.*). It also revealed a tender lumbosacral area and SI joint. (*Id.*). A straight leg raising test was negative. (*Id.*). Dr. Drogowski diagnosed chronic back pain secondary to Gauthier's operations, with radiculopathy and right SI joint in spasm, and managed his medications. (*Id.*).

On November 30, 2009, Gauthier returned to Dr. Drogowski, complaining of increased back pain and burning into his right leg all the way to his ankle. (Tr. 242). His symptoms increased with walking. (*Id.*). Upon exam it was noted that Gauthier's C5-7 were in mild spasm on the left, his lumbosacral spine and SI joint were tender and a straight leg raising test was mildly positive on the right. (*Id.*). Dr. Drogowski diagnosed Gauthier with "[r]ight leg radicular pain, increasing, [h]istory of recurrent lumbar disc disease status post multiple procedures" and "[c]ervical spine pain, tenderness, and right arm numbness likely osteoarthritis with nerve involvement." (Tr. 241). He ordered x-rays and MRIs and encouraged Gauthier to walk, stretch

and do physical therapy exercises.  (*Id.*).  While he prescribed Mobic, an anti-inflammatory, once a day for a week, he noted that Gauthier may hold off until completing a round of antibiotics, and then he recommended Gauthier use it "if necessary."  (Tr. 241).

An x-ray taken that same day of Gauthier's cervical spine showed "mild narrowing of the C4-C5 disc space and moderate to severe narrowing of the C5-C6 and C6-C7 disc spaces," as well as "[p]rominent marginal osteophytes [ ] seen anteriorly and posteriorly at the C5-C6 level." (Tr. 251; 263).   An MRI taken on December 3, 2009 of Gauthier's cervical spine showed "[m]oderate degenerative changes [ ] throughout the mid and lower cervical spine . . .  with changes producing a relative mild degree of central canal stenosis.  The underlying cord appears intact.  Unconvertebral arthritic change produces a moderate foraminal narrowing at multiple levels [ ]."  (Tr. 250; 277).  An MRI taken the same day of Gauthier's lumbar spine revealed "[d]egenerative changes with slight circumferential bulging disc, degenerative end plate change and marked facet arthropathies noted at L3-L4 produce a moderate degree of focal central canal stenosis and impingement upon the traversing nerve roots."  (Tr. 248-49; 262, 275).

On January 6, 2010, Gauthier underwent a physiatric consultation with Dr. Eugene Wang.  (Tr. 273-74).  Gauthier reported previous treatments including massage, physical therapy and acupuncture.  (Tr. 273).  Dr. Wang took a history from Gauthier and reviewed his recent MRI results, confirming "multilevel facet hypertrophy, broad-based disc bulging and disc desiccation" as well as "moderate central canal and foraminal stenosis at L3-L4 impinging on the bilateral L3 nerve roots" and "[a]t the L5-S1 level . . . evidence of lateral recess and foraminal stenosis impinging the bilateral S1 nerve roots."  (*Id.*).  An exam revealed a normal gait, limited range of motion in the lumbar spine, and flattening of the thoracic spine.  (Tr. 273-74).  Gauthier exhibited pain with palpation of the right SI joint, however his muscle strength was 5/5, his

8

sensation intact and his reflexes normal. (Tr. 274). Straight leg raising test, Scour's test and Patrick/FABER's tests were all negative. (*Id.*). Dr. Wang diagnosed Gauthier with right S1 radiculopathy and right SI joint dysfunction. (*Id.*). He recommended right S1 joint epidural steroid injections. (*Id.*). He also discontinued Gauthier's Darvocet and prescribed Vicodin instead. (*Id.*). Gauthier underwent his first injection on January 12, 2010, without complication. (Tr. 281-82).[2]

At a follow-up appointment on February 17, 2010, with a physician's assistant in Dr. Wang's office, Gauthier noted a 20% improvement over the three weeks since his first injection, although he still complained of throbbing, aching and burning pain. (Tr. 285). Upon exam he was found to be tender in the SI joint region and had a positive straight leg raising test bilaterally. (*Id.*). However, his muscle strength remained full. (*Id.*). Gauthier noted that he had recently enjoyed hunting bear and deer. (*Id.*). Gauthier was prescribed a repeat injection, physical therapy, and to continue using Vicodin as needed. (*Id.*).

Gauthier was seen again by Dr. Wang on February 26, 2010. (Tr. 284). He reported that his condition was unchanged from his last appointment and that he had increased his walking. (*Id.*). Upon examination his gait was noted to be antalgic, and a straight leg raising test was positive on the right. (*Id.*). His muscle strength remained full. (*Id.*). Another injection was ordered and administered that same day. (Tr. 284; 279-80). Dr. Wang noted that if this injection was not helpful he would consider inserting a spinal stimulator. (Tr. 284). There are no other records from Dr. Wang in the file.

Gauthier returned to Dr. Drogowski on April 30, 2010. (Tr. 328). He sought help with

---

[2] On January 25, 2010, Gauthier was seen by Dr. Timothy Burandt for a consultation regarding a possible bidirectional endoscopy. (Tr. 316-320). Dr. Burandt conducted a physical evaluation, and indicated that Gauthier "exhibit[ed] full range of motion without gross sensory or motor deficits." (Tr. 320).

his back pain, reporting that he had seen Dr. Wang the week prior and that due to the ineffectiveness of injections, Dr. Wang had recommended surgical intervention in the form of implanted electrodes, which Gauthier did not want done.  (*Id.*).  He reported continued pain radiating to his right leg into his foot.  (*Id.*).  He denied any weakness, but admitted to not being active due to the pain.  (*Id.*).  He had tried walking which increased his discomfort and reported he takes 1-2 Vicodin a night for pain, as well as Neurontin.  (*Id.*).  An exam revealed slight tenderness over the surgical incision site as well as in the right SI joint.  (*Id.*).  A straight leg raising test was mildly positive on the right and strength was slightly decreased on that side as well.  (*Id.*).  Reflexes were equal bilaterally.  (*Id.*).  Gauthier could stand on his tip toes and heel walk "fairly well."  (*Id.*).  Dr. Drogowski did note decreased range of motion "in almost every range attempted," although Gauthier admitted he had not been doing his stretches lately.  (*Id.*).  Dr. Drogowski agreed to await Dr. Wang's report, but in the meantime started Gauthier on Flexor patches, and recommended that Gauthier walk, stretch and engage in "other activity and weight loss efforts."  (Tr. 330).  He was also encouraged to consider physical therapy.  (*Id.*).

At a follow-up on May 19, 2010, Dr. Drogowski noted that Gauthier had since lost 12 pounds and that he was starting to do more walking and recently went on a fishing trip.  (Tr. 326).  However, it was noted that Gauthier's back pain remained persistent, "present daily and limits his activity."  (*Id.*).  Gauthier reported riding his ATV rather than walking in the woods, and that a twice-monthly massage helped him "more than anything else."  (*Id.*).  Gauthier reported taking Mobic twice a week, Vicodin at night "if needed" but not having filled the Flector patch due to cost.  (*Id.*).  Gauthier reported not following up with Dr. Wang's office because his recommendation was for a "pump" to be inserted surgically, an intervention Gauthier did not want.  (*Id.*).  Upon examination, Gauthier was tender over the lower lumbar incision and

the bilateral SI joint.  (*Id.*).  His sensation was intact and a straight leg raising test was negative. (*Id.*).  Dr. Drogowski recommended continuing weight loss efforts, increasing stretching and continuing massage.  He also gave Gauthier Flector patch samples and managed his medications. (Tr. 327).

Gauthier next returned to Dr. Drogowski almost four months later, on September 1 and 3, 2010, for an unrelated complaint and there was no mention in the treatment notes about his back. (Tr. 324-25).  However, on September 28, 2010, Gauthier returned complaining of, among other things, a recent consultative examination he underwent as part of his disability assessment.  (Tr. 321-23).  He complained that the examiner had not given him a complete examination, and that it lasted only five minutes.  (Tr. 321).  He reported that he "cannot do the work that he did previously especially walking around facilities," and that he limits activity due to pain and weakness.  (*Id.*).  He noted that his condition was "one of the reasons he retired," but that he "did not state that to his employer at the time."  (*Id.*).  Dr. Drogowski noted that Gauthier "ambulates in fairly normal, rises to the table normally, but slowly."  (*Id.*).  Upon examination, Dr. Drogowski noted tenderness over prior incision area and SI joint more right than left.  (*Id.*). Gauthier's paraspinal muscles were minimally tender and had a hint of spasm.  (*Id.*).  A straight leg raising test was mildly positive on the right and there was decreased strength in Gauthier's right thigh, accompanied by "a little bit of weakness."  (*Id.*).  Reflexes and sensations were normal.  (*Id.*).  Gauthier was diagnosed with "[c]hronic postoperative lumbar pain with right leg radicular symptoms and some weakness gradually worsening.  Dr. Drogowski again recommended Flector patches and referred Gauthier for a physical medicine evaluation and physical therapy.

Gauthier underwent a course of physical therapy from September 30, 2010 to October 15,

11

2010, consisting of eight sessions.  (Tr. 307-309).  His discharge summary reflected that no goals had been met over this period, and that he had achieved at most 50% success in some areas, while achieving no success in others.  (Tr. 307).  His therapy was terminated for insufficient gains and he was recommended to follow-up with his doctor "to discuss further treatment options."  (*Id.*).  A progress note from Gauthier's fifth therapy session noted that no progress had been achieved but that he was "willing to try physical therapy for 2 more weeks."  (Tr. 308).  He also reported the same level of pain and "difficulty standing for longer than 6-7 minutes."  (*Id.*).

On October 12, 2010, Gauthier was referred by Dr. Drogowski for a functional capacity examination, conducted by Gauthier's physical therapist.  (Tr. 295-305).  An exam revealed decreased range of motion in his trunk, myofascial tightness in the thoracolumbar region and paraspinals, and intact sensation.  (Tr. 301).  A straight leg raising test was positive on the right, but strength was grossly normal.  (*Id.*).  A low back nerve root test was within normal limits and reflexes were similarly normal.  (*Id.*).

After undergoing a series of documented tests, Gauthier was found to be able to occasionally lift 10 pounds floor to waist, 30 pounds waist to shoulder and 15 pounds overhead.  (Tr. 298).  He could occasionally carry 25 pounds bilaterally and pull 40 pounds.  (*Id.*).  He could frequently lift less than five pounds floor to waist, 10 pounds waist to shoulder and less than five pounds overhead.  (*Id.*).  He could frequently carry 15 pounds and pull 25.  (*Id.*).  Gauthier could only occasionally climb stairs, bend, squat repetitively or sustained, kneel, or crawl.  (*Id.*).  He could never reach overhead.  (*Id.*).  He was found to have no problem with grasping or fine dexterity and no problems using foot controls or with positions of his head or neck.  (Tr. 298-99).

During the exam Gauthier was recorded as having sat for thirty minutes at a time, for 45

12

minutes total, standing five minutes at a time for a total of 15 minutes, walking fifteen minutes at once, and standing and walking combined for a total of 60 minutes, 45 minutes at once. (Tr. 298). At one point, the exam findings stated that Gauthier's "limited positional tolerance for sitting, standing, and walking [ ] would prevent him from working more than 1-2 hours continuously in a given position." (Tr. 296). However, later the therapist found that Gauthier required the ability to change position much more frequently: every 20-45 minutes. (Tr. 298). The report also contained a field entitled "Client can do the following (in an 8 hour work day) with breaks:" and in bold below was typed the entry "Alternatively sit/stand/walk for 8 hours." (Tr. 298). But then there is a check box next to this section with possible answers of "Yes" or "No," and "No" was checked. (*Id.*). Regardless, the therapist ultimately limited Gauthier to sedentary work per the Dictionary of Occupational Titles ("DOT"). (Tr. 299).

The therapist noted that Gauthier's subjective pain complaints were reliable and although he presented with "somewhat elevated psychometric findings," his "overall subjective pain complaints and behaviors were found to be in fair proportion to the extent of his physical findings." (Tr. 296). The therapist concluded that Gauthier would benefit from continued pain management and a comprehensive physical therapy program. (Tr. 297).

Gauthier underwent a physical medicine consultation with Dr. James MacKenzie on December 3, 2010. (Tr. 331-33). Dr. MacKenzie received Gauthier's reports, reviewed his MRI results and conducted an exam. (*Id.*). The exam revealed mild tenderness at the incision site, but no major tenderness over the hips, the SI region or the sciatic notch. (Tr. 333). Gauthier had limited lumbosacral range of motion with pain noted on flexion and extension, and pain with side bending. (*Id.*). His gait "was not terribly antalgic" but a straight leg raising test was "consistently positive bilaterally in the long sitting and supine positions." (*Id.*). Dr. MacKenzie

noted no muscle wasting or gross motor or sensory deficits.  (*Id.*).  However, Gauthier did exhibit diminished reflexes at his right ankle.  (Tr. 332).  He was diagnosed with chronic low back pain and right lumbar radiculopathy symptoms.  (Tr. 333).  Dr. MacKenzie recommended a course of steroid injections at a different location than where they were previously placed by Dr. Wang and noted the possibility of a spinal stimulator being implanted.  (*Id.*).

Gauthier underwent a series of three lumbar injections over the course of four months, between December 21, 2010 and March 29, 2011.  (Tr. 334-39).  He noted a 30% improvement with the first injection, reporting that he had been able to do some work on an old car he owned. (Tr. 337).  On March 15, 2011, "he noted about two weeks of fairly good relief" after his second injection "followed by a gradual recurrence of symptoms."  (Tr. 336).  A third injection was performed on March 29, 2011, although Dr. MacKenzie noted that he had been discussing more the possibility of a spinal stimulator.  (Tr. 334-36).

On April 23, 2012, Dr. Drogowski wrote a letter stating that he had reviewed the October 12, 2010 physical therapist functional capacity exam and agreed with its findings except that he did "not believe that [Gauthier] could work on a consistent basis eight hours a day for five days per week.  This is based upon the diagnosis and treatment for Lumbar Spinal Stenosis status-post multiple procedures with limited pain relief."  (Tr. 340).  Dr. Drogowski stated that he believed Gauthier had been "restricted in this capacity since October 30, 2009 until the present date." (*Id.*).

### b.    *Consultative and Non-Examining Sources*

On June 15, 2010, Gauthier underwent a consultative evaluation with Dr. Scott Lazzara for the Disability Determination Service.  (Tr. 287-93).  Gauthier reported pain in his lower back that radiates to his right buttock and down his right leg to his foot.  (Tr. 289).  He reported that in

addition to medication "[h]is only therapy now consists of sitting in a tub which seems to help." (*Id.*).  Examination revealed good grip strength and dexterity, no difficulty getting on and off the table and no difficulty heel or toe walking.  (Tr. 290).  There was mild difficulty with squatting and hopping.  (*Id.*).  There was no paravertebral muscle spasm and a straight leg raising test was negative.  (*Id.*).  Dr. Lazzara documented Gauthier as having a slightly limited range of motion in his dorsolumbar spine, but no problems with range of motion in other areas.  (Tr. 291-92).  His reflexes and sensations were normal and his motor strength was full.  (Tr. 293).  Dr. Lazzara concluded that Gauthier had lower back pain, mostly secondary to his surgery.  (*Id.*).  He noted no radicular symptoms at the exam, and mild difficulty maneuvering due to stiffness.  (*Id.*).  He found a stable gait without the need for an assistive device and believed that Gauthier's central canal stenosis was mostly the result of his restless leg syndrome.  (*Id.*).  He noted that Gauthier "is not remediable and may require further operative intervention" but that he did "appear relatively stable at this point however."  (*Id.*).

### 4.   *Vocational Expert's Testimony*

VE Adolph Cwik testified that Gauthier's past work as an insurance company owner would be classified by the Dictionary of Occupational Titles ("DOT") as sedentary with a skill level ("SVP") of 8 as generally performed, but light as performed by him.  (Tr. 60-61). Transferrable skills would include "people management, organizational skills, paperwork organizing, supervisor experience, and the people skills would include in writing and by telephone." (Tr. 61).  He also noted the additional skills of sales, investigation and knowledge of risk management.  (Tr. 62).  The ALJ asked the VE to imagine a hypothetical person of Gautier's age, educational level and vocational background who was limited to:

> light work; the sit/stand option; never climbing ladders, ropes and scaffolds, occasional foot control operation; occasional climbing of stairs

> and ramps; occasional but not repetitive stooping; occasional kneeling;  . . . never crouching and never crawling and no twisting of the back; the individual should limit the exposure to vibration to a maximum of three hours a day in one half-hour increments, [and] should avoid all exposure to unprotected heights.

(Tr. 62).  She then asked if such an individual could perform Gauthier's past work.  (Tr. 62-63).  The VE testified that he could per the DOT description of the work, but not as actually performed by Gauthier.  (Tr. 63).  The ALJ then asked if there was other work such a person could perform.  (*Id.*).  The VE testified that such an individual would have a reasoning level of five, a math level of four and a language level of five, which would result in his being able to perform the job of ticket agent (2,960 jobs in the region) or automobile rental clerk (11,420 jobs).  (Tr. 64-65).

The ALJ then posed a second hypothetical to the VE limiting the individual to:

> sedentary, sit/stand option; this individual could do a floor to waist lift occasionally that is up to 33% of the time up to 10 pounds; waist to shoulder lift up to 30 pounds; overhead lift 15 pounds; bilateral carry 25 pounds this is occasional; and pulling up to 40 pounds . . .[o]ccasional stair climbing, bending; occasional repetitive squatting; occasional sustained squatting; occasional kneeling; occasional crawling and frequent overhead reaching; the individual could also do constant simple grasping – bilateral simple grasping, pushing, and pulling, and fine manipulation but from a sedentary with a sit/stand option.

(Tr. 65).  The VE testified that such an individual could perform the occupations of surveillance system monitor (2,790 jobs), ticket taker or gate attendant (3,040 jobs) or office manager (6,610 jobs).  The ALJ then added the condition that the individual would need a 15 minute break, which included reclining, every hour of work.  (Tr. 66-67).  The VE testified that such an individual would still be able to perform the office manager position.  (Tr. 67).  The VE similarly testified when the ALJ added the condition of being absent from work one day a week.  (*Id.*).  However, when the ALJ added the limitation that the days of work could not exceed eight hours

each, the VE testified that this combination of limitations would preclude work.  (*Id.*).

### C.      Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21

(E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout

the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is

not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that Gauthier was not disabled.  At Step One she determined that he had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 17).  At Step Two she found the following severe impairments: "status post lumbosacral laminectomy, status post fusion L4-L5, right side S1 radiculopathy, right sacroiliac joint dysfunction, [and] spinal arthritis."  (*Id.*).  At Step Three she determined that none of Gauthier's impairments, either alone or in combination, met or medically equaled a listed impairment, specifically comparing the medical evidence to Listing 1.04 (Disorders of the spine).  (Tr. 18).  The ALJ then assessed Gauthier's RFC, finding him capable of:

> sedentary work . . . except he would require a sit/stand option.  He could occasionally lift ten pounds floor to waist, thirty pounds waist to shoulder, fifteen pounds overhead, carry twenty-five pounds bilaterally, and pull forty pounds.  The claimant could occasionally climb stairs, bend, kneel, crawl and occasionally perform repetitive squatting, including occasional sustained squatting, and frequently reach overhead.  He could perform constant bilateral simple grasping, pushing, pulling, and fine manipulation.

(Tr. 18-21).  At Step Four she determined that, based on Gauthier's RFC and VE testimony, he was capable of returning to his past relevant work as it was generally performed per the description in the DOT, and thus he was not disabled.  (Tr. 21-22).  She made an alternative Step Five finding, concluding that Gauthier could also perform a significant number of other jobs in the national economy, per VE testimony, such that he would not be disabled even if he were unable to return to his past relevant work.  (Tr. 22-23).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative

18

decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.

*Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.   Analysis

Gauthier argues that the ALJ improperly assessed his credibility, which led to an RFC assessment that did not take into consideration all of his credible limitations.   The Court disagrees, and finds that the ALJ's assessment of Gauthier's credibility, its RFC assessment, and ultimate finding that Gauthier is not disabled are all supported by substantial evidence.

The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to his credibility.   *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).   Thus an ALJ's credibility determination will not be disturbed "absent compelling reason."   *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of her pain are credible.   *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

Here, the ALJ discussed in detail Gauthier's subjective testimony and reports regarding his complaints of pain and his limitations. (Tr. 19). She then discussed the record evidence, and pointed out specifically what evidence tended to discredit Gauthier's subjective complaints of disabling pain. (Tr. 19-20). The ALJ discussed the fact that despite Gauthier's complaints of an inability to walk, his doctor had found that he "walked fairly normally,"[3] and encouraged physical therapy, even though Gauthier had reported and testified that it did not help. (Tr. 19). The ALJ noted that Gauthier did not follow-up promptly on his doctor's recommendation for physical therapy and stopped it after only a month, which "suggests the symptoms may not have been as serious as alleged in connection with this application and appeal." (Tr. 20). The ALJ also noted that while Gauthier reported that he stopped working due to his condition, evidence in the record tended to suggest that he actually stopped working due to retirement. (*Id.*; Tr. 41-42; 321).

Furthermore, the ALJ found that Gauthier reported engaging in activities that were inconsistent with disabling pain, like hunting, fishing, and riding an all-terrain vehicle. (*Id.*). The ALJ noted that "[a]lthough such activities and a disability are not necessarily mutually exclusive, the claimant's decision to take part in them suggests the alleged symptoms and limitations may have been overstated." (*Id.*). She also noted that Gauthier reported being independent in personal care and being able cook some meals and do some household chores, and that his treatment had been "routine and conservative." (*Id.*).[4] All of these things, the ALJ

---

[3] Similarly, the ALJ discussed Dr. Lazzara's findings that Gauthier "had no difficulty getting on and off the examination table, no difficulty heel and toe walking…" (Tr. 20, 290).

[4] Gauthier takes issue with the ALJ's characterization of his treatment as "routine and conservative," noting that Gauthier had previously undergone three spinal surgeries. However, as the Commissioner points out, the ALJ's consideration of Gauthier's treatment all substantially post-dates his surgeries, and the Court finds that his level of treatment, including his relatively

reported, tended to cut against Gauthier's credibility. (*Id.*). Ultimately the ALJ found Gauthier to be partially credible to the extent his subjective reports and complaints were consistent with the limitations imposed by the ALJ's RFC. (*Id.*).

Looking at the record as a whole, the Court finds no compelling reason to disturb the ALJ's credibility determination. Although the ALJ recognized that Gauthier's impairments could reasonably be expected to cause his alleged symptoms and that his abilities are "no doubt limited," she gave the above valid reasons for discrediting Gauthier's allegation of disabling pain. (Tr. 19-20). The ALJ was in the best position to assess Gauthier's credibility at the hearing, and ultimately, she imposed an RFC that was substantially consistent with the limitations imposed by Gauthier's own physical therapist; in fact, the ALJ noted having imposed additional limitations above and beyond those imposed by that opinion. (Tr. 18-21).[5] Using that RFC, accompanied by VE testimony, the ALJ determined that Gauthier could perform his past relevant work as it was classified by the DOT, as well as perform a substantial number of other jobs in the national economy. (Tr. 21-23). After having reviewed the entire record, the Court finds no compelling reason to disturb the ALJ's credibility determination.

The Court also finds that the ALJ's RFC determination and overall finding that Gauthier is not disabled are supported by substantial evidence. In addition to the medical and other

---

infrequent use of narcotic medication (for instance Mobic only at night and Vicodin at night or "as needed" (Tr. 311; 326)), intermittent courses of physical therapy and spinal injections, and his refusal to entertain the idea of a spinal stimulator are not inconsistent with the ALJ's characterization of his treatment as being "routine and conservative."

[5] While the ALJ's analysis of physical therapist Samyn's opinion regarding Gauthier's ability to work an eight-hour day is not entirely clear, Dr. Drogowski seemed to interpret Samyn as concluding that Gauthier could work an eight-hour day (Tr. 340). Regardless, the ALJ appropriately noted that Samyn, as a physical therapist, is not an acceptable medical source (Tr. 21), 20 C.F.R. 404.1513, and Gauthier has not challenged the ALJ's analysis and usage of this opinion.

22

evidence cited above (all of which supports the ALJ's findings), the ALJ also cited Dr. MacKenzie's December 2010 report in which he found "no sensory or gross motor deficits and good range of motion in both hips,"[6] and Dr. Lazzara's findings that Gauthier showed no evidence of joint laxity, crepitance, or effusion, and that his grip strength and dexterity were unimpaired.  (Tr. 20).  The Court also notes that Gauthier did not need an assistive device to ambulate, had a negative straight leg test on numerous occasions, and had normal reflexes/sensation upon testing.  (Tr. 244-46, 274, 290, 293, 301, 321, 326, 328).  Accordingly, the ALJ did not err in finding that Gauthier failed to satisfy the elements of Listing 1.04 – Disorders of the Spine – which, as is relevant here, required compromise of a nerve root accompanied by sensory or reflex loss and positive straight leg raising.  (Tr. 18).  20 CFR Part 404 Subpart P, Appendix I, § 1.04.

For all of the above reasons, the Court finds that the ALJ's decision as a whole is supported by substantial evidence of record.

## III.   CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Gauthier's Motion for Summary Judgment **[14]** be **DENIED**, the Commissioner's Motion **[17]** be **GRANTED** and this case be **AFFIRMED**.

Dated: November 13, 2013                          s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                  United States Magistrate Judge

---

[6] The ALJ, quite appropriately, also noted those findings of Dr. MacKenzie's that supported Gauthier's alleged disability.  (Tr. 20).  However, as noted above, where the ALJ's decision is supported by substantial evidence, this Court must affirm that decision "even if substantial evidence also supports the opposite conclusion."  *Cutlip*, 25 F.3d at 286.

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 13, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

24